UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARLOS ALMONTE,

                Plaintiff,

- against -

INV. GILBERTO RODRIGUEZ and
INV. ELIAS CHACON,

                Defendants.

**OPINION AND ORDER**

15 Civ. 9762 (ER)

Ramos, D.J.:

      Carlos Almonte brings this action pursuant to 42 U.S.C. § 1983 and New York State law against New York State Police ("NYSP") Investigators Gilberto Rodriguez and Elias Chacon (together, "Defendants"). Plaintiff asserts claims for, among other things, false arrest and malicious prosecution in violation of his Fourth Amendment rights.

      Before the Court are Plaintiff's and Defendants' cross-motions for summary judgment. For the reasons discussed below, Defendants' motion is GRANTED and Plaintiff's motion is DENIED.

**I.   Background**

      Plaintiff is a Hispanic 26-year old resident of the Bronx. Pl.'s 56.1 ¶ 1. During the relevant time period, Plaintiff was a licensed livery driver associated with El Barrio Car Service, a Manhattan dispatcher. *Id.* ¶ 4–6. When working as a livery driver, Plaintiff drove a gray 2004 Honda Pilot with a New York State Taxi & Limousine Commission ("TLC") license plate, which he rented from his cousin, Christian Jimenez. *Id.* ¶ 7.

Defendants are investigators in the Money Laundering Unit of the NYSP. Defs.' 56.1 ¶ 8. In April 2015, the Money Laundering Unit was conducting an ongoing investigation into a suspected narcotics and money laundering operation. *Id.* ¶ 9. In connection with that investigation, on April 22, 2015, Defendants and their colleagues, Investigators Fiordaliso and Herrera, were conducting surveillance of a target they believed resided at 2001 Story Avenue in the Bronx. *Id.* ¶ 10. The officers did not know the name of the target at that time; they later identified him as Juan Rodriguez. *Id.* ¶ 11.

The officers arrived at 2001 Story Avenue at approximately 10 a.m. *Id.* ¶ 14. Each officer was in his own unmarked NYSP vehicle; they communicated with each via radio. *Id.* ¶ 13. At approximately 2:03 p.m., Investigator Fiordaliso observed a 2004 gray Honda Pilot with a TLC-issued license plate pull up to the corner of Puglsey Avenue and Story Avenue. *Id.* ¶ 15. The officers ran the license plate and learned that the car was registered to a Christian Jimenez. *Id.* ¶ 17. Investigator Fiordaliso observed that the driver—who they later determined was Plaintiff—was a Hispanic male, *Id.* ¶ 16, and that another Hispanic male—who they later identified as Rafael Castro-Guzman—was sitting in the front passenger seat. *Id.* ¶ 21. Investigator Fiordaliso then saw Juan Rodriguez leave 2001 Story Avenue and enter the backseat of the Honda. *Id.* ¶ 22. The Honda began driving away and the officers followed it in their unmarked vehicles. *Id.* ¶¶ 23–24.

At approximately 2:16 p.m., the Honda pulled up to 1231 Harrod Avenue in the Bronx, and Juan Rodriguez exited the car and entered the building. *Id.* ¶ 25. The Honda remained parked outside of 1231 Harrod Avenue while Plaintiff and Castro-Guzman waited in the vehicle. *Id.* ¶¶ 26, 29. Approximately one-half hour later, at 2:44 p.m., one of the officers observed Juan

Rodriguez return to the Honda and get into the backseat. *Id*. ¶ 30. After the Honda drove off, the officers lost sight of it. *Id*. ¶ 31.

Approximately 45 minutes later, the officers found the Honda and resumed surveillance. *Id*. ¶ 32. Investigator Chacon observed the vehicle parked at East Tremont Avenue and Anthony Avenue; he saw that Plaintiff was in the vehicle but was unable to determine whether Juan Rodriguez was in the backseat. *Id*. ¶ 33. Investigator Chacon then saw Castro-Guzman exit a Western Union and walk towards the Honda; the two then left the Honda and entered a restaurant together. *Id*. ¶¶ 34–35. At approximately 4:20 p.m., the officers returned to 2001 Story Avenue to attempt to continue surveilling Juan Rodriguez. *Id*. ¶ 36. They did not observe Juan Rodriguez again that day and left at approximately 4:50 p.m. *Id*. ¶ 38.

The following day, Defendants and Investigator Fiordaliso arrived at 2001 Story Avenue to conduct further surveillance of Juan Rodriguez. *Id*. ¶ 39. At approximately 1:00 p.m., a gray Honda Pilot with two men pulled up to the corner of Pugsley Avenue and Story Avenue. *Id*. ¶ 40. Investigator Fiordaliso immediately recognized the Honda to be the same vehicle he had observed pick up Juan Rodriguez the day before. *Id*. ¶ 41. The officers eventually recognized Plaintiff and Castro-Guzman as the same men who had picked up Juan Rodriguez the day before. *Id*. ¶¶ 42–43. Juan Rodriguez exited the building and got into the backseat of the Honda. *Id* ¶ 44. The officers followed the Honda to 1881 Grand Concourse Avenue in the Bronx. *Id*. ¶¶ 46–47.

Juan Rodriguez exited the Honda and entered the building empty-handed. *Id*. ¶¶ 51–52. Plaintiff and Castro-Guzman waited outside in the Honda. *Id*. ¶ 53. At approximately 1:30 p.m., Juan Rodriguez exited 1881 Grand Concourse Avenue holding a brown satchel bag and got into the backseat of the Honda. *Id*. ¶¶ 58–59, 61. The Honda then drove away, and the officers

3

followed. *Id*. ¶ 62. Shortly thereafter, Investigator Rodriguez activated his lights and sirens and pulled the vehicle over. *Id*. ¶ 63. Investigator Rodriguez approached the driver—Plaintiff—and asked for his license and registration, which Plaintiff provided. *Id*. ¶ 64–65. Investigator Rodriguez observed that Plaintiff had a class E license, which Investigator Rodriguez knew to be issued to taxi and livery drivers. *Id*. ¶ 66. Plaintiff told Investigator Rodriguez that the individual in the backseat was a fare that he had picked up. *Id*. ¶ 67. While Investigator Rodriguez spoke with Plaintiff, Investigator Chacon began speaking with Castro-Guzman. *Id*. ¶ 68. At the same time, Investigator Fiordaliso began speaking with Juan Rodriguez, who was still in the backseat. *Id*. ¶ 69.

Plaintiff and Defendants offer conflicting versions of the events that followed. According to Defendants, Investigator Fiordaliso instructed Juan Rodriguez to exit the Honda. *Id*. ¶ 70. After Juan Rodriguez complied, Investigator Chacon—who had observed a brown satchel on the floor of the passenger-side back seat of the Honda—asked Juan Rodriguez if the satchel belonged to him and Juan Rodriguez said that it did. *Id*. ¶¶ 71–73. Investigator Chacon then asked if he could look inside the satchel, and Juan Rodriguez said that he could do so. *Id*. ¶ 74. Investigator Chacon opened the brown satchel and found what appeared to be approximately 3.5 kilograms of heroin inside. *Id*. ¶ 75.

During his deposition in this case, Plaintiff testified to a different version of the events leading up to Investigator Chacon's discovery of the heroin. Plaintiff testified that Juan Rodriguez was holding the brown satchel on his lap with both hands, and that one of the officers repeatedly asked who owned the satchel and Juan Rodriguez said that it belonged to him. Pl.'s 56.1 ¶ 33. According to Plaintiff's deposition testimony, the officer asked if he could look inside the satchel and Juan Rodriguez said no; when the officer asked why not, Juan Rodriguez said

4

that it was his and it was private. *Id*. Plaintiff testified that the officer then opened the door of the Honda, took the satchel, opened it, and discovered the heroin. *Id*.

After Investigator Chacon found the heroin, Investigator Rodriguez instructed Plaintiff to exit the vehicle, Plaintiff complied, and Investigator Rodriguez placed Plaintiff under arrest. *Id*. ¶ 37. Juan Rodriguez and Castro-Guzman were also arrested. *Id*. ¶ 38. All three men were then transported to the New York City Police Department's 46th precinct. *Id*. ¶ 42; Defs.' 56.1 ¶ 77. Once at the precinct, Investigator Chacon was in charge of processing the arrests and filled out the arrest forms. Pl.'s 56.1 ¶ 44.

That evening, Investigator Rodriguez swore out a complaint that commenced criminal proceedings against Plaintiff, Juan Rodriguez, and Castro-Guzman for criminal possession of a controlled substance.[1] Siegle Decl., Ex 13. Plaintiff was arraigned on April 24, 2015. Defs.' 56.1 ¶ 86. Plaintiff was held in jail on $50,000 bail from April 23, 2015 through April 29, 2015. Pl.'s 56.1 ¶ 53. The charges against Plaintiff were dismissed in September 2015. Defs.' 56.1 ¶ 91.

## II. Procedural History

On December 15, 2015, Plaintiff filed the Complaint against Defendants and the State of New York, asserting seven causes of action: (1) Section 1983 claim for false arrest; (2) Section 1983 claim for malicious prosecution; (3) Section 1983 claim for violations of his Fifth

---

[1] The parties dispute whether Defendants failed to inform the Assistant District Attorney (the "ADA") in charge of the prosecution that Plaintiff was a licensed livery driver. *See* Pl.'s Mem. at 6; Defs.' Mem. at 19. According to Plaintiff, Defendants' alleged failure to communicate that fact to the ADA demonstrates that Defendants acted with malice, an element of Plaintiff's malicious prosecution claim. For reasons discussed below, even if Defendants had indeed withheld that fact from the ADA, the Court's decision in this matter would remain the same.

5

Amendment and Fourteenth Amendment due process rights; (4) false arrest claim under state law; (5) malicious prosecution claim under state law; (6) assault claim under state law; and (7) battery claim under state law. Doc. 1. During a pre-motion conference held on March 18, 2016, Plaintiff agreed to dismiss without prejudice his third cause of action (due process claim under the Fifth and Fourteenth Amendments) and all claims against the State of New York. Doc. 18. Defendants filed an Answer on April 4, 2016. Doc. 21. Plaintiff filed the instant motion for summary judgment on February 7, 2017. Doc. 33. Defendants filed a cross-motion for summary judgment on March 17, 2017. Doc. 39.

### III. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might "affect the outcome of the litigation under the governing law." *Id.* (quoting *Miner v. Clinton Cty. N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).

**IV. Discussion**

    **A. Section 1983**

Section 1983 grants a right of action to any "citizen of the United States or other person within the jurisdiction thereof" who has been deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege that: (1) a right secured by the

7

Constitution or federal law was violated by defendants, and (2) the alleged violation was committed by a person acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Here, Plaintiff alleges, among other things, that he was falsely arrested and maliciously prosecuted in violation of his Fourth Amendment rights.

### 1. False Arrest

Plaintiff moves—and Defendants cross-move—for summary judgment on Plaintiff's false arrest allegations against Defendants. Doc. 33, Doc. 39. "[A Section] 1983 claim for false arrest derives from the Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). To establish a claim for false arrest under Section 1983, a plaintiff must prove: (1) that the defendants intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement, (3) did not consent to it, and (4) that the confinement was not otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451 (1975)).

Defendants do not contest that Plaintiff has properly alleged the first three elements of his false arrest claim. Thus, the only disputed element is whether the arrest was otherwise privileged; *i.e.*, whether Defendants had probable cause to arrest Plaintiff. If Defendants had probable cause to arrest Plaintiff, then the confinement is privileged and constitutes a complete defense to a false arrest claim. *Covington v. City of N.Y.*, 171 F.3d 117, 122 (2d Cir. 1999) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d. Cir. 1996)); *see also Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (noting that to avoid liability for a claim of false arrest, an arresting officer may demonstrate that he had probable cause for the arrest).

8

### i. Probable Cause

The existence of probable cause may be determined as a matter of law on summary judgment where there is no material dispute as to the relevant events and knowledge of the officers. *See Weyant*, 101 F.3d at 852. "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* When determining whether probable cause exists, courts are to "consider those facts *available to the officer* at the time of the arrest and immediately before it" and must render a decision based upon "the totality of the circumstances." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted) (emphasis in original); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Defendants argue that the circumstances of this case are "clearly sufficient to warrant Defendants' reasonable belief that Plaintiff was an active participant in the criminal activity of [Juan Rodriguez]." Defs.' Reply at 2. The facts that Defendants claim establish probable cause are largely undisputed: on April 22, 2015, Defendants and their team members observed Plaintiff arrive, unhailed, at the home of Juan Rodriguez, a narcotics trafficking suspect; they saw that he arrived with another passenger who, based on later observations, did not fit the characteristics of a paying customer; they observed Plaintiff drive Juan Rodriguez to another location, wait outside that location for one-half hour with the other passenger until Juan Rodriguez returned to the vehicle, and begin driving; the next day, they saw Plaintiff once again arrive at Juan Rodriguez's home, together with the very same passenger as the day before, pick up Juan Rodriguez, drive him to another location, wait outside until Juan Rodriguez—who had

9

previously been empty-handed—exited the building holding a satchel that they later determined had 3 kilograms of heroin.[2] *Id.* at 2–3, 6–7; *see also* Pl.'s Reply at 3–4.

According to Defendants, "[t]his conduct is more than sufficient to give Defendants probable cause to believe that Plaintiff was acting in concert with Juan Rodriguez and knew that the satchel he was carrying on April 23, 2015 contained heroin." Defs.' Mem. at 14. Defendants contend that in determining whether probable cause exists, the Court should consider the circumstances surrounding Plaintiff's arrest through the lens of Defendants' law enforcement experience and training. In particular, Defendants contend that in their experience, it is unusual for a livery driver to arrive to pick up a passenger with another passenger already in the vehicle and it is also unusual for a kilogram-level narcotics trafficker, such as Juan Rodriguez, to entrust a random individual who is not involved in the narcotics transaction, to drive him around with such large quantities of heroin. Defs.' Reply at 4–5.

According to Plaintiff, "[o]ther than seeing Plaintiff drive the Defendants' target twice, Defendants possessed absolutely no other evidence connecting plaintiff to drugs possessed by Defendants' target in the backseat of Plaintiff's livery vehicle on April 23, 2015." Pl.'s Reply at

---

[2] Plaintiff and Defendants agree that the brown satchel belonged to Juan Rodriguez. *See* Defs.' 56.1 ¶¶ 71–73; Pl.'s 56.1 ¶ 33. As such, Plaintiff would have no standing to object to the search on the ground that it was unconstitutional. "When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States v. Paulino*, 850 F. 2d 93, 96 (2d Cir. 1988). "In order to prevail on a contention that a search violated the Fourth Amendment, an accused must show that he had a legitimate expectation of privacy in a searched place or item." *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987). Because Plaintiff neither owned nor possessed the brown satchel, he did not have a legitimate expectation of privacy. In any event, probable cause may still be established in this action even if the search had been unconstitutional. *See Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir.1999) ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because . . . the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); *Cyrus v. City of New York*, 450 Fed. App' x 24, 26 (2d Cir.2011) (assuming initial arrest unlawful, evidence discovered incident to arrest admissible to support probable cause defense in the subsequent § 1983 action); *Machado v. Weare Police Dept.*, 494 Fed. App'x 102, 104–07 (1st Cir. 2012) (even assuming initial stop of vehicle was illegal, discovery of drugs during search provided "ample" probable cause to justify arrest).

4. Addressing Defendants' other observations, Plaintiff first argues that the fact that Plaintiff arrived at Juan Rodriguez's home unhailed is insignificant because by law, livery drivers are only permitted to pick up passengers by pre-arrangement. *Id*. at 6. With respect to Defendants' observation that Plaintiff waited for Juan Rodriguez after dropping him off at a location, Plaintiff contends that "it is common for livery drivers to drive fares to destinations, wait for them, and then take them to another destination, sometimes returning the fare home to the very location they started from." *Id*. at 7. Regarding Castro-Guzman's presence in Plaintiff's vehicle, Plaintiff argues that "it is not unusual at all to have multiple fares in a livery vehicle at the same time given current ride-sharing arrangements." *Id*. at 7–8. Finally, regarding Defendants' claim that it is unusual in their experience for a narcotics dealer to entrust a random driver not involved in the narcotics business, Plaintiff contends that "it seems highly more probable that people involved in high level narcotics transactions would desire as few people to be aware of their business as possible, including the people that drive them around." *Id*. at 9–10.

Based on Defendants' observations on April 22 and 23, 2015, the Court finds that Defendants had probable cause to arrest Plaintiff. While each of Defendants' observations, viewed in isolation, may be consistent with innocent conduct, the Court must "examine the totality of the circumstances." *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008); *see also United States v. Arvizu*, 534 U.S. 266 (2002) (holding that by declining to give weight to any observation "that was by itself readily susceptible to an innocent explanation" the lower court engaged in erroneous "divide-and-conquer analysis."); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.").

At the outset, the Court notes that it takes the officers' law enforcement experience and expertise into account in determining whether probable cause exists. *See United States v. Zabala,* 52 F. Supp. 2d 377, 382 (S.D.N.Y. 1999). Evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418 (1981). The Court also notes that it gives little weight to Defendants' observation that Plaintiff arrived to pick up Juan Rodriguez "unhailed." As Plaintiff indicates, experienced law enforcement officers reasonably should have known that livery drivers are not allowed to pick up "street hails" and are only allowed to operate by pre-arrangement with a passenger.

Nevertheless, the totality of Defendants' other observations gives rise to probable cause, especially when viewed in light of Defendants' law enforcement training and experience. *See Delossantos*, 536 F.3d at 161 ("[A]lthough [plaintiff] posits innocent explanations for his conduct, we must evaluate the facts in light of the training and experience of the arresting agents."); *United States v. Price*, 599 F.2d 494, 501 (2d Cir.1979) ("[S]ome patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before. As long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience should not be disregarded.") (internal quotation marks and citation omitted).

On two consecutive days, Defendants observed Plaintiff pick up an individual they were specifically investigating on suspicion of narcotics trafficking and money laundering, drive him to various locations, and wait outside for the suspected narcotics dealer to return to the vehicle. On the second day, the suspected narcotics dealer returned to the car with a significant amount of

12

heroin. At the same time, Defendants observed that Plaintiff was accompanied by someone who reasonably appeared to be an associate and not a mere ride-sharing passenger. For example, on April 22, Defendants observed as Castro-Guzman—who was already in the car when Juan Rodriguez was picked up—waited in the Honda with Plaintiff for one-half hour for Juan Rodriguez to return from inside the building where he had been taken. Then, after the officers lost and recovered sight of the Honda, they observed Castro-Guzman exit a Western Union, walk towards the Honda, and enter a restaurant with Plaintiff. Defs.' 56.1 ¶¶ 34–35. These observations lead Defendants to reasonably conclude that Castro-Guzman was no mere passenger. As Defendants contend, courts have given due weight to law enforcement officers' testimony that "a dealer who is uneasy about a transaction will often bring an associate for assistance and protection." *See Delossantos*, 536 F.3d at 161.

Moreover, the Court weighs heavily Defendants' assertion that in their experience, it is unusual for a kilogram-level narcotics dealer, such as Juan Rodriguez, to engage in drug transactions involving large quantities of heroin with random individuals. Defs.' Mem. at 13–14. Courts have given due weight to law enforcement testimony that "in their experience, a drug dealer rarely brings along an uninvolved bystander during drug deals." *See Delossantos*, 536 F.3d at 161. Thus, a reasonable law enforcement officer would conclude that the fact that Juan Rodriguez chose Plaintiff to drive him to a drug deal involving multiple kilogram quantities of heroin suggested—in light of Defendants' other observations over two days of surveillance—that Plaintiff was acting in concert with Juan Rodriguez.

### i. Qualified Immunity

Even if probable cause did not exist, the Court finds that Defendants are entitled to qualified immunity. "The doctrine of qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly

13

established statutory or constitutional rights . . . or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Bradway v. Gonzales*, 26 F.3d 313, 317–18 (2d Cir. 1994) (internal quotation marks and citations omitted). "[A]n arresting officer is entitled to qualified immunity on a claim of false arrest if either: (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 203 (E.D.N.Y. 2010) (Bianco, J.) (citing *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999). The Second Circuit has defined the latter standard, commonly referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (quotation marks and internal citations omitted) (emphasis in original). Only where an officer's "judgment was so flawed that no reasonable officer would have made a similar choice," is the denial of qualified immunity appropriate. *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (citing *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995)).

The inquiry of whether a public official is entitled to qualified immunity is a mixed question of law and fact. *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). Where there is no material factual dispute, it is appropriate for the district court to assess the

reasonableness of the defendants' conduct under the circumstances presented and to rule on qualified immunity at the summary judgment stage. *Lennon*, 66 F.3d at 421.

Based on the totality of the circumstances of Plaintiff's arrest, the doctrine of qualified immunity applies here. Taking into account Defendants' observations over the course of two days and their relevant law enforcement experience and training, a reasonable officer could have concluded that probable cause existed to arrest Plaintiff for criminal possession of a controlled substance.

Accordingly, the Court Defendants' motion for summary judgment on Plaintiff's Section 1983 claim for false arrest is GRANTED.

### 2. Malicious Prosecution

A claim for malicious prosecution under Section 1983 is "substantially the same" as a claim for malicious prosecution under New York law. *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (citing *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003)). "To establish a claim for malicious prosecution under New York law, a plaintiff must show '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.'" *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 226 (S.D.N.Y. 2006) (quoting *Posr*, 180 F.3d at 417). In addition to these state law elements, a plaintiff must assert that there was "a sufficient post-arraignment liberty restraint to implicate plaintiff's Fourth Amendment right[]" to be free of unreasonable seizure. *Id.* (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)) (internal quotation marks omitted). Probable cause is a complete defense for claims of malicious prosecution,

similar to claims of false arrest. *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) (citation omitted).

It is undisputed that Defendants initiated a prosecution against Plaintiff, that the prosecution was terminated in Plaintiff's favor, and that Plaintiff was held in jail post-arraignment. Therefore, the only issues in dispute are whether Defendants lacked probable cause to believe the proceeding could succeed and whether Defendants acted with malice. Plaintiff contends that because "no probable cause existed to arrest plaintiff in the first place . . . there was no probable cause to prosecute plaintiff." Pl.'s Reply at 12; *see also* Pl.'s Mem. at 18. Plaintiff also contends that Defendants acted with malice by intentionally withholding exculpatory information from the ADA, namely that Plaintiff was a licensed livery driver and was driving a licensed livery vehicle when he picked up Juan Rodriguez. Pl.'s Mem. at 18–19.

As discussed, Defendants had probable cause to arrest Plaintiff. "Even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir.1996). However, Plaintiff's only basis for asserting that Defendants lacked probable cause to initiate the prosecution is that they lacked probable cause to arrest Plaintiff in the first place. As Defendants indicate, Plaintiff has not set forth any facts indicating that probable cause dissipated between his arrest and the initiation of the prosecution. *See* Defs.' Reply at 7. "The existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Because the Court finds that Defendants had probable cause to arrest Plaintiff, and there is no indication that probable cause dissipated in any manner between Plaintiff's arrest and the initiation of the prosecution, Plaintiff's malicious prosecution claim fails.

Moreover, Defendants are entitled to qualified immunity with respect to the malicious prosecution claim because—as the Court already determined—Defendants had arguable probable cause to arrest Plaintiff. *See Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) ("Plaintiff's . . . malicious prosecution [claim] therefore turn[s] on whether the defendant officers' probable cause determination was objectively reasonable—that is, whether there was arguable probable cause to arrest."). Because Plaintiff's claim fails on the probable cause prong of the inquiry, the court need not determine whether Defendants acted with malice. Accordingly, Defendants' motion for summary judgment on Plaintiff's Section 1983 claim for malicious prosecution is GRANTED.

### B. Pendant State Law Claims

In addition to his Section 1983 claims, Plaintiff brings state law claims for false arrest, malicious prosecution, assault, and battery. "The elements of false arrest and malicious prosecution under Section 1983 are substantially the same as the elements under New York law. Therefore, the analysis of the state and the federal claims is identical." *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). Because the Court has already found that Defendants had at least arguable probable cause to arrest and initiate a prosecution against Plaintiff, Plaintiff's state law false arrest and malicious prosecution claims are also without merit. Accordingly, Defendants' motion for summary judgment on Plaintiff's state law false arrest and malicious prosecution claims is GRANTED.

Plaintiff's state law assault and battery claims are premised on Plaintiff's contention that his arrest was unlawful. Pl.'s Mem. at 20 ("[T]he only issue [with respect to Plaintiff's assault and battery claims] is whether the arrest was unlawful. . . . [D]efendants possessed no probable cause for his arrest. Accordingly, plaintiff's arrest was unlawful, and this Court should grant

17

plaintiff's motion for summary judgment on plaintiff's [assault and battery claims].")._ Because the Court has determined that Defendants had at least arguable probable cause to arrest Plaintiff, Plaintiff's arrest was not unlawful. Accordingly, Defendants' motion for summary judgment on Plaintiff's assault and battery claims is GRANTED.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in full and Plaintiff's motion is DENIED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 33, 39, and close the case.

It is SO ORDERED.

Dated: September 8, 2017
New York, New York

Edgardo Ramos, U.S.D.J.